IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **SHERRY M. MOSS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 11-853-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Sherry M. Moss is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disabled Widow's Benefits (DWB).[1]

## Procedural History

Plaintiff filed an application for DWB in September, 2008, alleging disability beginning on July 2, 2008. (Tr. 154-155). The application was denied initially and on reconsideration. After holding an evidentiary hearing, Administrative Law Judge (ALJ) Stuart T. Janney denied the application for benefits in a decision dated January 29, 2010. (Tr. 19-29). Plaintiff's request for review was denied by the Appeals Council, and the January 29, 2010, decision became the final agency decision. (Tr. 1-6).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

## Issue Raised by Plaintiff

Plaintiff raises the following issues:

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 13.

1. The ALJ improperly rejected the opinion of her treating doctor, Dr. Davis, and failed to consider her impairments in combination.

2. The ALJ's assessment of her RFC was not supported by substantial evidence in that the ALJ rejected all medical opinions.

3. The ALJ improperly concluded that plaintiff was able to do her past work as a cook/bartender because that is a composite job.

4. The credibility analysis was faulty.

## **Applicable Legal Standards**

To qualify for DWB a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental

---

[2]The regulations pertaining to DWB are found at 20 C.F.R. §§ 404.335 and 404.337. The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The definition of disability is the same for both kinds of benefits. See, 20 C.F.R. § 404.335(c), incorporating the definition of disability set forth in the DIB regulations into the DWB regulation. For convenience, most of the citations herein will be to the DIB statutes and regulations.

impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue***, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined:  (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Ms. Moss was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**)).  This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into

consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater***, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue***, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that Ms. Moss had done some part-time work since the alleged onset date, but it did not rise to the level of substantial gainful activity. She met the non-disability requirements for DWB, and the period of eligibility ends on October 31, 2014. The ALJ found that plaintiff had severe impairments of chronic obstructive pulmonary disease (COPD), osteoarthritis, a history of methicillin-resistant staphylococcus aureus (MRSA) and a history of Parvovirus infection. He found that her alleged anxiety was not a severe impairment.

The ALJ further determined that plaintiff's impairments do not meet or equal a listed impairment. The ALJ found that Ms. Moss had the residual functional capacity to perform a limited range of work at the light exertional level. Relying on the testimony of a vocational expert, the ALJ concluded that she was able to perform her past relevant work as a bartender. (Tr. 19-29).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.    Agency Forms**

Plaintiff was born in December, 1956, and was 51 years old on the alleged onset date.

(Tr. 177).  She was 5' 7" and weighed 114 pounds.  (Tr. 181).

Plaintiff said that she was unable to work because she had MRSA and could not be around people because it was contagious.  She also alleged memory loss and loss of strength due to MRSA.  She said she was fired from her job on July 2, 2008, because she had MRSA.   (Tr. 182).  Plaintiff indicated that she "caught MRSA while in the county jail."  (Tr. 185).

Ms. Moss attended school through the 10th grade.  (Tr. 187).  She had worked as a cook/bartender, waitress and an in-home personal assistant.  (Tr. 189).

**2.     Evidentiary Hearing - December 14, 2009**

Plaintiff was represented by counsel at the evidentiary hearing.  (Tr. 37).

Ms. Moss testified that she was able to read and write and to do simple mathematics.  (Tr. 42).  She lived with her boyfriend.  (Tr. 51).  She had worked as a cook/bartender at the American Legion.  (Tr. 45).  She worked for a time in a Walgreens' distribution center, and as a personal care attendant.  (Tr. 46-47).

Plaintiff testified that "every joint in my body hurts to walk, to sit, to lay."  (Tr. 51).  The pain was worse in her hands, elbows and knees.  Sometimes pain medication helped, but sometimes not.  She said she had pain 80-90% of the time.  She had not had physical therapy.  She also had breathing difficulties.  (Tr. 52-53).

Dr. Davis was treating her at the time of the hearing.  He prescribed medication for her.  He wanted her to see a specialist, but it had not been set up because he said it would be "costly."  (Tr. 55).  She used an inhaler and was taking Norco for pain.  She also took Celebrex.  The inhaler helped her breathing.  The ALJ asked if Norco and Celebrex helped her pain, and she replied that "Celebrex doesn't."  (Tr. 55-560).

Plaintiff testified that she could walk for 10 to 15 minutes, stand for 10 minutes and sit for 30 minutes.  It was difficult for her to grip and lift things with her hands.  (Tr. 57-59).  She also had memory problems, which started when she had a high fever from MRSA.  (Tr. 59-60).

She had been smoking half a pack of cigarettes a day for about 10 years. (Tr. 60).

Ms. Moss testified that she had limited daily activities. She cooked sometimes, using a microwave. She read newspapers. She shopped once or twice a month. She did dishes maybe twice a week and vacuumed once a month. She did not do any yardwork. (Tr. 62-63). She and her boyfriend liked to ride motorcycles, but she had not been able to ride since the summer of 2008. She sometimes went to motorcycle club meetings. (Tr. 63-64). She has had anxiety attacks. (Tr. 66).

Ms. Moss testified that she had used her savings to get medical care. (Tr. 67).

The ALJ asked the vocational expert (VE) to assume a person who could do light work, with only occasional postural activities, occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolding, only occasional exposure to pulmonary irritants and to hazards such as unprotected heights or moving machinery. (Tr. 73). The VE testified that this person could not do plaintiff's past work of cook/bartender as she performed it because she could not perform the functions of a cook. He testified that cooking was "part of the essential functions" of her job. (Tr. 75). However, he went on to testify that she could do the job of bartender as it is generally performed. (Tr. 75).

The ALJ asked the VE to assume a more restrictive hypothetical which included the above limitations with the addition of only frequent reaching, handling and fingers with both upper extremities. The VE testified that this person could still do plaintiff's past work as a bartender. The ALJ added a limitation to simple, repetitive tasks for 2 hours at a time in an environment that was not stringently production or quota based. The VE testified that this person could not do plaintiff's past work as a bartender, but would be able to do other jobs which exist in significant numbers in the national and regional economies, such as hand packer, packaging/filling machine operator and production worker/assembler. (Tr. 76-78).

## 3.   **Medical Records**

Ms. Moss was admitted to Good Samaritan Regional Health Center in Mt. Vernon, Illinois, through the emergency room on July 16, 2008, because of cellulitis and multiple abscesses in her lower extremities.  The history and physical note indicates that, about two weeks earlier, she had begun developing folliculitis (inflammation of hair follicles) in both legs, which progressed to abscesses and cellulitis (infection of the skin) in the right leg.  She was brought to the emergency room by correctional officers, as she was in custody at the county jail on a battery charge.  (Tr. 293).  It was determined that she had MRSA cellulitis.  She was treated with IV antibiotics.  She was discharged to home in improved condition on July 27, 2008.  The diagnoses were MRSA cellulitis, now improved, in left hip and right shin and anxiety disorder.  (Tr. 292).

She was seen in follow-up by Dr. Edgardo Emilia in August and September, 2008.  She complained of aching all over since July, 2008, and muscle spasms in her lower leg.  She had trouble sleeping.  (Tr. 323-326).

She was seen at Southside Medical Clinic in October, 2008, complaining of rib pain when coughing and wheezing.  The assessment was COPD, chronic bronchitis, rib pain and insomnia.  (Tr. 380).  In January, 2009, she was seen for night sweats.  The assessment was pre-menopausal syndrome.  (Tr. 379).

Ms. Moss was again admitted to the hospital on January 7, 2009, with recurrent chills and fever with shortness of breath and suprapubic pains.  She had a history of severe COPD with recurrent pneumonia in the past.  She also had a history of recurrent urinary tract infection and chronic back pain.  She smoked about a pack of cigarettes a day for "many years" and had a history of ethanol abuse.  (Tr. 349-350).  She was treated with intravenous antibiotics and hydration. She was discharged in improved condition on January 11, 2009. The final diagnoses were bacterial sepsis, COPD, dehydration, colonic diverticulosis and uterine fibroids.  She was to receive a shot of Rocephin, an antibiotic, each day for five days as an outpatient, and was prescribed Neurontin to take as needed.  She was advised to follow-up with her doctor and to

stop smoking.  (Tr. 387).

Plaintiff began seeing Dr. Dennon Davis on September 11, 2009.  She said that she hurt "all the time," mostly in her hands, and that most of her joints hurt.  She said that she had gone from working 46 hours a week to barely being able to work 20.  She had tried Celebrex and it did not work.  On exam, she had decreased breath sounds but no wheezing.  She had osteoarthritic changes of both hands, no crepitus with range of motion of the elbows or knees, and pain in the left shoulder.  She had a full range of motion of the spine and extremities.  Strength was 5/5 throughout.  Her gait was normal.  The assessment was osteoarthritis, tobacco use, anxiety and insomnia.  Dr. Davis prescribed Voltaren gel and Voltaren tablets "if able to afford."  He also prescribed Celexa to be taken at bedtime.  She was to continue using her Albuterol inhaler as needed, and Dr. Davis strongly advised her to quit smoking.  (Tr. 428-430).

Ms. Moss returned to Dr. Davis on October 26, 2009, for management of osteoarthritis.  She said that her pain was so intense that she could not function.  She had been unable to work all week, and she had a few anxiety attacks.  On exam, she had pain and tenderness with palpation over her forearms and in her right elbow, with mild swelling.  She had mild osteoarthritic changes of the hands with no gross deformities.  Dr. Davis prescribed a Medrol dose pack, and Norco for "severe pain."[3]  He ordered some lab work.  (Tr. 424-426).  A test for rheumatoid factor was negative.  (Tr. 419).

Ms. Moss returned on November 23, 2009, to get her medication refilled.  She said that she starting hurting again after the Medrol pack was gone.  Her physical exam was normal.  She told Dr. Davis that taking 2 Norco at once "will last all day."  She had not filled her prescription for Voltaren tablets.  Dr. Davis prescribed Norco and Voltaren tablets.  He advised her that she probably had an autoimmune problem and she needed to consult a rheumotologist.  (Tr. 416-

---

[3]Medrol is a steroid used to treat arthritis, lupus and other conditions.  See, http://www.drugs.com/mtm/medrol-dosepak.html, accessed on November 8, 2012.

417).

**4.**     **RFC Evaluations**

A state agency physician reviewed medical records as of December 4, 2008, and

determined that plaintiff's impairments were non-severe.  (Tr. 337-339).  A second state agency

physician reviewed additional records and agreed with this assessment on February 18, 2009.

(Tr. 381-383).

Dr. Davis assessed plaintiff's RFC by completing a form on December 7, 2009.  He

opined that she could never lift any weight, could occasionally carry up to 10 pounds, stand/walk

and sit for a total of 1 hour each a day, and had to lay down for the rest of the day.  She was

limited to only occasional reaching, handling and feeling and could never push/pull with her

hands.  She could never climb ladders or scaffolds or kneel, crouch or crawl.  She could

occasionally climb stairs, balance and stoop.  When asked to identify the medical or clinical

findings which supported his assessment, Dr. Davis wrote "only been pt [patient] since 09/09, no

findings on file."  (Tr. 435-441).

Dr. Davis wrote a letter on January 4, 2010, stating that he had been asked to review

"prior records."  He reviewed a "very thorough and well summarized hospital and outpatient

summary from her Lawyer Joni Beth Bailey over the past 2 yrs prior to the patient seeing me."

Dr. Davis explained that he suspected that Ms. Moss had an autoimmune inflammatory arthritis,

but was hampered in getting tests by the fact that she had no insurance.  She did have some

testing which showed an elevated antibody for Parvovirus, suggesting that she had the infection

in the past.  He noted that he was not a rheumotologist, but stated his professional opinion that

her recent illnesses such as sepsis "may have triggered this seronegative inflammatory arthritis

this patient seems to be suffering from."  (Tr. 442).

**5.**     **Evidence Not Before the ALJ**

The transcript contains an exhibit, 20F, that was not before the ALJ.  Plaintiff submitted

this evidence to the Appeals Council.  See, AC Exhibits List, Tr. 5.

Exhibit 20F, located at Tr. 443-510 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence.  Evidence "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." **Luna v. Shalala, 22 F3d 687, 689 (7th Cir. 1994).** See also, **Getch v. Astrue, 539 F.3d 473, 484 (7th Cir. 2008); Rice v. Barnhart, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).**

### Analysis

ALJ Janney rejected the opinions of the state agency physicians and of Dr. Davis.  He gave the state agency physicians' opinions no weight because he found that Ms. Moss does have severe impairments.  With regard to the opinions expressed by Dr. Davis in his report and letter, the ALJ assigned them little weight because he had treated plaintiff for only a short time, admitted on the form that there were no findings to support his opinion, and his opinion was contradicted by his office notes, which generally showed "benign findings."  (Tr. 27).

Plaintiff argues that the ALJ improperly rejected Dr. Davis' opinion.  She is incorrect.

First, to the extent that Dr. Davis was opining as to plaintiff's RFC, such opinions are *not* entitled to any special weight because the issue of RFC is an issue that is reserved to the Commissioner.  See, 20 C.F.R. §404.1527(e).  SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2.  See also, **Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010)**.

20 C.F.R. §1527(a)(2) defines medical opinions as statements that reflect judgments about "the nature and severity of your impairment(s), including your symptoms, diagnosis and

prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Even though he is a treating doctor, Dr. Davis' medical opinion is not automatically entitled to controlling weight. Rather, it is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel***, 227 F.3d 863 (7th Cir. 2000); ***Zurawski v. Halter***, 245 F.3d 881 (7th Cir. 2001).

With regard to the assessment of treating source opinions, **20 C.F.R. §404.1527(d)(2)** states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [emphasis added]

As the Seventh Circuit recently stated, "An ALJ can give less weight to a doctor's opinion if it is internally inconsistent or inconsistent with the other substantial evidence in the record as long as she articulates her reasons for giving the opinion less weight, 20 C.F.R. § 404.1527(c)(3), (4); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)." ***Hall ex rel. Hall v. Astrue***, 2012 WL 2948173, *2 (7th Cir. 2012). The ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." ***Berger v. Astrue***, 516 F.3d 539, 545 (7th Cir. 2008); ***Elder v. Astrue***, 529 F.3d 408, 415 (7th Cir. 2008).

Here, the ALJ articulated three reasons for giving little weight to Dr. Davis' opinion: he had only treated her for a short time, he admitted that there were no findings to support his

opinion and his office notes generally showed benign findings. (Tr. 27). These are appropriate considerations, and the ALJ easily met and exceeded the requirement that he "minimally articulate" his reasons. *Filus v. Astrue*, **694 F.3d 863, 868-869 (7th Cir. 2012).** See also, *Elder v. Astrue*, **529 F.3d 408, 415 (7th Cir. 2008)**.

Plaintiff takes issue with the reasons articulated by the ALJ, arguing that the January 4, 2010, letter remedied the deficiencies identified by the ALJ. Her argument is, however, factually incorrect. She argues that, by the time of the January 4, 2010, letter, Dr. Davis had seen plaintiff for more office visits, "giving him a chance to evaluate her symptoms over time and assess her response to prescription medications for arthritis and pain." Doc. 25, p. 7. This is not true. The last visit with Dr. Davis occurred on November 23, 2009, before Dr. Davis completed his first report. (Tr. 416). There is no evidence in the record that Dr. Davis saw plaintiff again between his first report of December 7, 2009, and his letter of January 4, 2010. Plaintiff also suggest that the test which showed the presence of Parvovirus antibodies was done in between the first report and the letter. Doc. 25, p. 7. Again, this is not true. That test result was reported on November 16, 2009, prior to Dr. Davis' first report. (Tr. 408).

As far as the evidence establishes, the only thing that happened between the first report and the letter was that Dr. Davis reviewed a summary of prior medical treatment given to him by plaintiff's counsel. (Tr. 442). Contrary to plaintiff's argument, this review of prior treatment did not undermine the ALJ's conclusion that Dr. Davis' opinion was inconsistent with the benign findings that were reflected in his own office notes.

This Court concludes that the ALJ did not err in weighing Dr. Davis' opinion. However, plaintiff is correct that, since all of the medical opinions in the record were rejected, the ALJ's assessment of plaintiff's RFC lacked substantial support. The Commissioner does not directly respond to this argument in his brief.

An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." **Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005), citing SSR 96-8p, at \*7.** Here, the ALJ failed to cite medical facts to support his RFC assessment. He said that plaintiff's osteoarthritis "justifies restricting her to light exertional work with frequent reaching, handling and fingering bilaterally." (Tr. 28). He pointed to no medical evidence that supported the conclusion that Ms. Moss was able to perform the exertional requirements of light work, i.e., occasionally lifting 20 pounds, frequently lifting 10 pounds, sitting for 6 out of 8 hours and standing/walking for 6 out of 8 hours. He said that her COPD was accounted for by restricting her to no more than occasional exposure to environmental irritants, but cited to no medical evidence to support the conclusion she was able to tolerate even occasional exposure. He said, with no explanation, that her history of MRSA was accounted for by limiting her to light work. Because the ALJ failed to link his RFC assessment to evidence in the record, he failed to build the requisite logical bridge from the evidence to his conclusion. **Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011).**

This case is similar to **Suide v. Astrue, 371 Fed.Appx. 684, 690 (7th Cir. 2010)**, relied upon by plaintiff. There, the ALJ rejected the opinion of the treating doctor, creating an "evidentiary deficit" which the ALJ impermissibly filled by using her own lay opinions. The Seventh Circuit reversed, holding that the RFC assessment was not supported by substantial evidence. **Ibid.** Here, the rejection of the opinions of the state agency consultants and of Dr. Davis created an evidentiary deficit in that there was no medical evidence to support the conclusion that plaintiff had the RFC to do light work with the limitations assessed by the ALJ. Therefore, the Commissioner's final decision cannot stand.

Because of the ALJ's errors, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that

Ms. Moss was disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those  issues to be determined by the Commissioner after further proceedings.

**<u>Conclusion</u>**

The Commissioner's final decision denying Sherry M. Moss' application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:  November 9, 2012.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**